2021 IL App (2d) 210093-U
No. 2-21-0093
Order filed June 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* JAYDEN L. G., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Boone County. |
| | ) | |
| | ) | Nos. 19-JD-3 |
| | ) | 19-JD-4 |
| | ) | 19-JD-5 |
| | ) | |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Jayden L. G., Respondent- | ) | C. Robert Tobin, |
| Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1     *Held*: Respondent in a juvenile delinquency case was not denied effective assistance of counsel when post-adjudication counsel did not file a post-adjudication motion to preserve his claim of ineffective assistance of adjudication counsel because such a motion is not required in juvenile delinquency cases to preserve an issue for appeal, and the outcome would not have been different had the issue of adjudication counsel's effectiveness been raised in the trial court.

¶ 2     At issue in this appeal is whether post-adjudication counsel failed to provide effective assistance to respondent, Jayden L. G., a delinquent minor, by failing to preserve a claim of ineffective assistance of adjudication counsel. We find that no prejudice resulted from post-

adjudication counsel's representation of respondent because (1) a post-adjudication motion is not required to preserve an issue for appeal in a juvenile proceeding, and (2) even if the ineffective assistance claim had been raised in the trial court, the outcome would not have been different because adjudication counsel's representation did not fall below an objective standard of reasonable professional representation. Therefore, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In January 2019, respondent was charged in three delinquency petitions with one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2018)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2)(i) (West 2018)). The petitions alleged that: (1) on March 23, 2018, respondent, by threatening the use of force, knowingly had G.A.J. place his tongue on respondent's penis for the purpose of sexual gratification, (2) on March 23, 2018, respondent knowingly placed his tongue on G.A.J.'s penis for the purpose of sexual gratification, and (3) between April 10, 2017, and April 10, 2018, respondent knowingly placed his hand on G.H.J.'s penis for the purpose of sexual gratification. On February 24, 2020, respondent was adjudicated a delinquent minor after being found guilty on all three petitions. At the dispositional hearing on January 25, 2021, respondent was made a ward of the court, allowed to reside with his parents, and placed on probation for a period of 12 months subject to numerous conditions.

¶ 5                          A.  The Adjudication Proceedings

¶ 6      The State presented the testimony of, *inter alia,* Haylee J., the mother of the minor victims, and Joanna Deuth, a forensic interviewer with the Carrie Lynn Children's Advocacy Center (Center). Their testimony regarding certain hearsay statements made by the minor victims was deemed admissible after a pretrial hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2018)).

¶ 7    Haylee is the mother of G.A.J. and G.H.J., ages six and five respectively at the time of the hearing. She also has two older children, Jo.J. and Ja.J., ages 9 and 12. Haylee testified that she lives with her husband and their children in a two-story house in Belvidere. The second floor has three bedrooms and a loft located at the top of the stairs which is furnished with a couch, television, and the children's toys. The respondent is a neighbor who was friends with Ja.J. Respondent is one year ahead of Ja.J. in school. Haylee stated that respondent would come over several times a week to play both inside and outside her home. While inside, the boys would play in their rooms and the loft. Haylee testified that respondent was invited to attend "different activities" with her family, including a Halloween event at their church which respondent attended.

¶ 8    Haylee testified that on the afternoon of March 23, 2018, respondent had been playing with her children both outside and inside at her home, including upstairs. Later that evening, Jo.J. told her that G.A.J. said something happened with respondent that day. At that time, respondent was 11 years old and G.A.J. was almost 4 years old. When Haylee asked G.A.J what happened, he told her that respondent had pulled down G.A.J.'s pants and licked his "wiener." Haylee testified that "wiener" was a word G.A.J. used to refer to his penis. G.A.J. also said that respondent pulled down his own pants and made G.A.J. lick his wiener. When Haylee asked him why he did it, G.A.J. said that respondent threatened to punch him in the face if he did not comply. Haylee talked to all of her children "a day or so later" about private parts, appropriate and inappropriate touching, and "who is allowed to see your private parts." She stated that when she had this discussion with G.H.J., who was five years old at the time, he told her that respondent had "touched him in his wiener." He told her it happened one day when he was laying down in the loft of their home. G.H.J. told her respondent came in, pulled down G.H.J.'s pants and underwear, and touched him on the wiener.

¶ 9    Haylee testified that "a week or so later," she went to the Belvidere police station and filed a report. She explained that she did not go right away because she and her husband took some time to discuss the situation and figure out the next steps that they needed to take. They did not talk to respondent's parents.

¶ 10    Belvidere Police Detective Paul Derry testified that he investigated the case after the initial report was filed. He testified regarding photographs he took of the minor victims' home. He stated that he did not take photos of the minor victims, examine them physically, or take them to a medical practitioner for examination. Detective Derry arranged for the minor victims to be interviewed at the Center within a couple of weeks.

¶ 11    Joanna Deuth testified that as a forensic interviewer with the Center she is trained to conduct child-friendly, age-appropriate, and developmentally-appropriate interviews of children when there has been alleged abuse. She explained the process from the time a child arrives at the Center until they leave. As the interviewer, Deuth only has contact with the child during the actual interview which is recorded. Interviews are also observed through a one-way mirror in the room by a law enforcement investigator, sometimes an investigator from the Department of Children and Family Services, and often a state's attorney. During interviews, she uses a body diagram which is an outline of a child's body to guide the discussion and assist in identifying the terminology the child uses to describe various parts of the body. Deuth testified that she followed these procedures when she interviewed G.A.J. and G.H.J separately at the Center on April 10, 2018. By agreement of the parties, the judge reviewed the video recordings of the interviews.

¶ 12    During his interview with Deuth, G.A.J. listed his family members and identified the parts of the body on a diagram. He referred to the penis as "pee," "wiener," and "wiener dog." He said that he knew respondent as a friend of his brother. G.A.J. said respondent told him to let respondent

lick his "wiener" and threatened to punch him if he did not. Respondent also made G.A.J lick respondent's wiener. G.A.J said this happened in G.H.J.'s room and no one else was present.

¶ 13    During his interview, G.H.J. also identified the parts of the body on the diagram, referring to the penis as "wiener." G.H.J. said that respondent touched his wiener "lots of times" in the upstairs "living room," though later he said respondent only touched him one time.  When asked what the minor used to touch his wiener, G.H.J. initially said "nowhere" but later he said respondent used his hand.

¶ 14    The testimony of G.H.J. and G.A.J. during the adjudication hearing was consistent with their prior interviews.  During his testimony, G.H.J. described that the incident occurred when he was playing in the loft area on the second floor of his home.

¶ 15    Respondent testified on his own behalf.  He said that he had not been at Haylee's house on March 23, 2018. He further answered "no" to all questions when asked whether he had ever licked G.A.J.'s penis, commanded G.A.J. to lick his penis, commanded G.A.J. to touch his penis, shown G.H.J. his penis, touched G.A.J.'s penis, or touched G.H.J.'s penis. On cross-examination, respondent acknowledged Ja.J. is a year younger than him, and they had been friends since sometime after 2012 when Ja.J.'s family moved into the neighborhood.  Respondent had been at Ja.J.'s house many times. He restated that he had not been at the house on March 23, 2018. Respondent stated that when he went to Ja.J.'s house, he spent time with Ja.J. He said he did not see G.A.J. and G.H.J. very often, rarely interacted with them, and had only been upstairs and in the loft area one or two times.

¶ 16    At the conclusion of the hearing, the trial court ruled that the State met its burden of proof as to all three counts. The court found respondent's testimony regarding how often he had visited the minor victims' home and how many times he had been upstairs in the house to not be credible.

He further found incredible respondent's testimony that he had not been at the home on March 23, 2018, noting that it was contrary to all other witnesses' testimony. The court determined that the testimony of G.A.J. and G.H.J. was credible. The court found there to be no reason for Haylee or the minor victims to lie. The court noted "[t]here's no reason for the mom to lie. She didn't have any problems with the family. She didn't have any problems with this individual." The trial court ordered a social history be conducted and the matter was set for a dispositional hearing.

¶ 17                          B.  The Dispositional Proceedings

¶ 18    A dispositional hearing was scheduled for April 13, 2020; however, the case was continued multiple times over the months that followed. On July 29, 2020, respondent's attorney filed a motion to withdraw as counsel asserting that he could no longer represent respondent due to differences he had with respondent and his parents regarding his representation of respondent. The motion was granted on August 10, 2020, and the public defender's office was appointed to represent respondent.

¶ 19    Numerous continuances were granted until the matter was finally set for a dispositional hearing on January 25, 2021. A social history report, completed in November 2020, and a sex offender risk assessment (risk assessment), dated October 6, 2020, were submitted to the court on the day of the dispositional hearing.

¶ 20    The risk assessment was completed by Dr. Robert Meyer, a licensed clinical psychologist. In the risk assessment, respondent explained that "this all started because of problems" he had with Haylee. Respondent was friends with Ja.J. and Jo.J. and spent a lot of time with them playing sports. He stated that he liked the boys but their "mother was very unusual." In the risk assessment, respondent explained:

"She was always trying to get me to go with them to their church, a Mormon Church. I told her many times that 'we're Catholic,' but she never seemed to listen and was always on me about going to church with them. In fact, she attempted to make me feel bad by asking me 'what's wrong with you?' and 'why won't you go to Church with us?' She even went so far as giving me a Mormon bible which my parents took away from me. They consider the Mormon church a cult. This continued on and on, but I wanted to stay friends with [Ja.J.]. We continued to play and go back and forth between each other's houses. The two younger boys who are the alleged victims were never really around us. I never really spent much time with them at all."

¶ 21    In the risk assessment, respondent further described that Haylee would ask him if there was some kind of abuse going on at his house. Respondent told her no, but she did not seem to believe him. He stated that Haylee became "hostile" and "cold" toward him and his family. Once when respondent's cousin's basketball team was scheduled to play Ja.J.'s team, respondent said that he bet that his cousin's team would win. Respondent said Haylee and Ja.J. got very upset about this; and around this time Haylee told respondent he was not allowed to come to their house anymore. In February 2018, respondent said that his parents decided that he should not go to Haylee's home anymore. In the risk assessment, respondent adamantly denied ever touching the minor victims inappropriately. He said "I was never even around those boys. I had nothing to do with them, particularly after February of 2018 because I never went over there anymore." He stated that this has been "very stressful" and "I felt like the victim here, I really think the mother put those boy up to this because we didn't turn into Mormons. I think she must have coached them all the way through."

¶ 22    Dr. Meyer concluded in the risk assessment that respondent has a low risk for reoffending. He noted, however, risk factors included respondent's guarded and defensive demeanor during the evaluation and no known prevention plan in the home. He recommended individual psychotherapy and psychoeducational intervention to address appropriate sexual boundaries and healthy sexual behavior. Dr. Meyer suggested family therapy would be helpful to promote emotional support and accountability.

¶ 23    On January 25, 2021, the order of disposition was entered. Respondent was made a ward of the court, allowed to reside with his parents, placed on probation for a period of 12 months, and required to comply with numerous conditions, including participating in counseling and having no contact with the minor victims or their family. The trial court advised respondent regarding his right to appeal:

"The right to appeal the judgment of conviction excluding the sentence imposed or modified will be preserved only if a notice of appeal is filed in the trial court within 30 days from today's date.

Prior to taking an appeal, if you seek to challenge the correctness of the sentence or any aspect of the sentencing hearing, you must file in the trial court within 30 days of today's date a written motion asking to have me reconsider the sentence I imposed or consider any challenges to the sentencing hearing.

***

And, finally, in order to preserve your right to appeal following the disposition of the motion to reconsider or any challenges regarding the sentencing hearing, you must file a notice of appeal in the trial court within 30 days from the entry of the order that disposes

of your motion to reconsider the sentence or the order that disposes of any challenges to the sentencing hearing."

¶ 24    On February 3, 2021, respondent's public defender filed a motion for a new trial or directed finding of not guilty arguing the following:

"1.  That the State did not prove the guilt of the Minor beyond a reasonable doubt.

2. The Minor raises all issues that would be revealed after a careful review of the transcripts that has not been obtained by the Minor's attorney, who was newly appointed on these matters some time after the bench trial occurred. The Minor also has not yet reviewed said transcript with the assistant public defender appointed to represent him or discussed the potential issues of ineffective assistance of prior counsel.

3.  That any delay in filing this motion is due to a withdrawal in these matters by prior counsel."

¶ 25    At the next status date on February 22, 2021, the trial judge stated that he did not believe he could rule on respondent's motion because it was filed well beyond 30 days after trial, but he acknowledged that the rules may be different in a juvenile proceeding. Respondent's counsel explained that she filed the motion because, in preparing to file a notice of appeal, she realized that no posttrial motion had been filed by respondent's previous attorney. A status date was set for March 8, 2021, to allow the parties to research whether the posttrial motion could be heard. However, the judge recalled the case the next day to inform the parties that a posttrial motion is not required in juvenile proceedings to preserve any issues for appeal.  Based upon this information, respondent's attorney withdrew her motion and informed the court that she would be filing a notice of appeal. This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    The sole issue raised by respondent on appeal is whether his post-adjudication counsel was ineffective by failing to preserve respondent's claim of ineffective assistance of his adjudication counsel.

¶ 28    A minor charged with an offense has a nonwaivable right to the effective assistance of counsel in juvenile delinquency proceedings. 705 ILCS 405/5-170(b) (West 2018); *People v. Austin M.,* 2012 IL 111194, ¶ 74. The *Strickland* standard for assessing the effectiveness of counsel in criminal proceedings also applies to juvenile proceedings. *In re Danielle J.,* 2013 IL 110810, ¶ 31; *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish ineffective assistance of counsel, defendant must show (1) counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the minor. *Danielle J.,* 2013 IL 110810, ¶ 31.  Prejudice means a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 19. A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy either prong precludes a finding of ineffectiveness. *People v. Simpson,* 2015 IL 116512, ¶ 35.

¶ 29    Respondent argues that his post-adjudication counsel was ineffective because she failed to review the transcripts of the adjudication hearing which she had not attended and failed to file a post-adjudication motion to preserve respondent's claim of ineffective assistance by his adjudication counsel. Respondent argues further "[c]ounsel's failure caused the minor substantial prejudice because the record shows that the minor had a potentially viable claim of ineffective assistance of counsel against his trial counsel that only could have been preserved by raising it in a post-trial motion."

¶ 30    First, we address respondent's argument that preservation of an issue for appeal in juvenile delinquency proceedings requires filing a post-adjudication motion. This argument is erroneous.

The supreme court held that a minor who has been adjudicated delinquent is not required to include a claim of error in a written post-adjudication motion to preserve an error for review. *In re W.C.,* 167 Ill. 2d 307, 327 (1995). The court explained:

> "A post-adjudicatory motion does not appear necessary to assist the circuit court, the parties or the reviewing court in the delinquency process. If anything, a post-trial motion unnecessarily adds to that process and burdens the participants. Moreover, given the purposes of the [Juvenile Court Act of 1987 (705 ILCS 405/1 *et seq*. (West 2018))], we hesitate to construe it to allow for procedures more restrictive of a juvenile's right to appeal." *Id*. at 326-27.

Because a post-adjudication motion was not required in this case, failure to file one caused respondent no prejudice.

¶ 31    It is worth noting here that respondent's undertaking to file a posttrial motion after the dispositional hearing and the discussion regarding the timeliness of the motion during the status hearing on February 22, 2021, reveal confusion regarding the proper procedures required to preserve an issue for appeal in juvenile proceedings. To clarify, we admonish respondent that an adjudication of delinquency is not a final and appealable order. Rather, a finding of guilt and a dispositional order constitute a final and appealable order in a juvenile proceeding. *People ex rel. Devine v. Stralka,* 226 Ill. 2d 445, 458 (2007) ("The finding of guilt and a disposition of probation constitute a final and appealable order."); *In re Michael D.,* 2015 IL 119178, ¶ 13 ("The final judgment in a juvenile delinquency case is the dispositional order."). The post-adjudication motion being unnecessary (as the trial judge correctly informed the parties on February 23, 2021), respondent's right to appeal, including the claim of ineffective assistance of his adjudication counsel, attached upon issuance of the dispositional order (as the trial judge correctly advised

respondent on January 25, 2021).

¶ 32    Although no prejudice occurred because of counsel's failure to file a post-adjudication motion, our inquiry does not end here. To fully consider whether prejudice occurred, this court must also consider whether the outcome would have been different had respondent's post-adjudication counsel raised the issue of ineffective counsel in the trial court. In doing so, we must examine the claimed ineffectiveness of respondent's adjudication counsel.

¶ 33    Respondent argues that his adjudication counsel was ineffective for failing to present a defense that Haylee fabricated G.H.J.'s and G.A.J.'s accusations as retaliation for respondent's disinterest in her efforts to share her religious beliefs. He argues that his post-adjudication counsel failed to make a record of this defense, therefore, "the record is insufficient in its current state because post-trial counsel failed to review a transcript to discover the issue." Having reviewed the record on appeal, we find it sufficient to review the claimed ineffectiveness of adjudication counsel.

¶ 34    To establish deficient performance under the *Strickland* standard, respondent must overcome the strong presumption that his attorney's action or inaction was the result of sound trial strategy. *People v. Wise,* 2019 IL App (2d) 160611, ¶ 52. Decisions such as what witnesses to call at trial, what evidence to present on a defendant's behalf, and what theory of defense to pursue are matters of trial strategy that rest within the discretion of the trial counsel. *People v. West,* 187 Ill. 2d 418, 432 (1999). "A defendant may overcome the deferential view that the challenged action or inaction of counsel was a matter of sound trial strategy by showing that counsel's decision was 'so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Rogers,* 2015 IL App. (2d) 130412, ¶ 71 (quoting *People v. Jones,* 2012 IL App (2d) 110346, ¶ 82).

¶ 35    In this case, adjudication counsel's decision to *not* pursue a defense that Haylee fabricated the allegations and coached G.A.J. and G.H.J. to accuse respondent of sexual abuse was a matter of trial strategy and fell within the range of reasonable professional representation. Under the fabrication theory, counsel would have been asking the trial court to reach the conclusion that this mother contrived the sexual abuse allegations, coached her young children regarding the sexual abuse story, intentionally put her children through the distress of telling the story multiple times all for the purpose of retaliating against an eleven-year-old child whom she had welcomed into her home to play with her children several times a week over the past several years. The retaliation the court would be asked to consider was that Haylee was upset because respondent and presumably his parents, declined to adopt Haylee's religious beliefs.  Further, respondent maintained that he was in Haylee's home on the day of the alleged incident and that even when he did visit her home, he rarely saw or interacted with the minors. Under the circumstances, we find that it is not irrational or unreasonable that counsel would choose to forgo the fabrication theory. Because we cannot find that counsel's representation was below an objective standard of competence, respondent's claim of ineffective assistance of adjudication counsel fails the *Strickland* test.

¶ 36    As previously stated, a defendant must satisfy both prongs of the *Strickland* test to prevail on an ineffective assistance claim. *People v. Simpson,* 2015 IL 116512, ¶ 35. We conclude that respondent has failed to satisfy the prejudice prong of the *Strickland* test in his argument that post-adjudication counsel's representative was ineffective. We find that no prejudice resulted from post-adjudication counsel's representation of respondent because (1) a post-adjudication motion was not required to preserve the issue of ineffective assistance of adjudication counsel and (2) even if the claim were raised in the trial court, the outcome would not have been different because adjudication counsel's representation did not fall below an objective standard of competence.

Therefore, we affirm.

¶ 37                              III. CONCLUSION

¶ 38    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 39    Affirmed.